**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to: All cases. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

## DECLARATION OF NEIL J. OXFORD

I, Neil J. Oxford, an attorney duly admitted to practice law before the courts of the State of New York, hereby declare under penalty of perjury:

1. I am a partner at Hughes Hubbard & Reed LLP, counsel for Plaintiff Skatteforvaltningen ("SKAT"), the Customs and Tax Administration of the Kingdom of Denmark, in these actions. I am fully familiar with the matters set forth in this declaration.

2. I submit this declaration in support of SKAT's Memorandum of Law in Support of its Motion for Issuance of a Request for International Judicial Assistance to Obtain Evidence (Letters Rogatory). The facts stated in this declaration are true to the best of my knowledge and belief.

3. Attached hereto as Exhibit 1-A – 1-H are proposed Letters of Request for International Judicial Assistance Pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.

4. Attached hereto as Exhibit 2 is the Amended Complaint from SKAT v. The Bradley London Pension Plan & Doston Bradley, No. 18-cv-04047-LAK (S.D.N.Y. April 24, 2020).

I. **CASE BACKGROUND**

5. In May and June 2018, Plaintiff SKAT filed 140 similar complaints in eleven different federal judicial districts. On October 3, 2018, the federal complaints were consolidated in a Multi-District Litigation ("MDL") and assigned to the Honorable Lewis A. Kaplan. On February 26, 27, and 29, 2019, SKAT filed 43 additional complaints, which were consolidated into the MDL assigned to Judge Kaplan. On November 19, 2019, SKAT filed an additional related complaint, which has also been incorporated into the MDL.

6. This case stems from an allegedly fraudulent tax refund scheme to deceive SKAT into paying out over 12.7 billion Danish Kroner ("DKK"), the equivalent of approximately $2.1 billion (US), of allegedly withheld dividend tax. Each of over 300 entities that claimed tax refunds ("SKAT Refund Claimants") represented themselves as pension plans purporting to own shares in Danish companies listed on the OMX Copenhagen 20 Index, the 20 most-traded stocks in Denmark ("Danish Securities").

7. Danish companies are required to withhold 27% tax on dividends they pay to shareholders. Under certain double taxation treaties between Denmark and other countries, including the United States, this tax is reimbursable to certain non-Danish shareholders.

8. The SKAT Refund Claimants, acting through their agents and representatives, applied to SKAT claiming repayment of dividend withholding tax ("DWT") allegedly withheld on dividends that they purported to have earned on shares of Danish companies that they claimed to own. These applications were fraudulent because the SKAT Refund Claimants did not own the shares they claimed to own, did not earn the dividends they claimed to have earned, and were not entitled to the tax refunds they claimed. These applications were also fraudulent because the

claimants falsely represented that they met the qualifications set forth in the double taxation treaty between Denmark and the United States for a full repayment of the tax withheld on dividends. Based on the fraudulent tax refund claims, SKAT paid baseless withholding tax refunds of approximately $1,234,288,400 (US) to the SKAT Refund Claimants. SKAT Refund Claimants that were based in the United States, along with certain of their authorized representatives, partners, and otherwise affiliated individuals, are the "Defendants."

9. The principal organizer of the scheme for a vast majority of the Defendants is believed to be Sanjay Shah ("Shah"), who through his company Elysium Global (Dubai) Limited controlled, directed, and/or influenced many of the parties that effectuated the scheme, including custodians, payment agents, trading counterparties, and entities that acted as conduits for distribution of the proceeds of the fraudulently obtained refund payments.

10. The third parties involved in the scheme fall into the following categories:

   a. Custodians, which purported to hold the shares for Defendants and for trading counterparties, and to clear trades after they had been executed. The Custodians issued "credit advices," which Defendants submitted in their refund applications to SKAT, to document Defendants' purported ownership of shares.

   b. Payment Agents, which submitted Defendants' refund claims to SKAT.

   c. Trading Counterparties, with which Defendants purported to trade in order to generate the fraudulent trading records necessary to claim DWT refunds from SKAT, were typically British Virgin Islands ("BVI") or Cayman Islands ("Cayman") companies. The Trading Counterparties played a variety of different roles, as further set out at paragraphs 23 to 26 below.

d. <u>Conduit Entities</u>, which were involved in channeling the funds to the perpetrators of the fraud after SKAT paid out the DWT refunds, and were also typically BVI or Cayman companies.

11. All of the offshore companies to which the Letters Rogatory relate were involved in the scheme in at least one of these capacities. In some cases SKAT has already obtained direct evidence that Shah and his associates controlled a number of these companies. While the majority of the Defendants submitted "credit advices" provided by custodians controlled by or related to Sanjay Shah, approximately 10% of the fraudulent claims were submitted to SKAT using "credit advices" from ED&F Man Capital Markets ("<u>ED&F Man</u>"). SKAT has obtained evidence that a number of BVI companies listed below were involved in this portion of the fraudulent applications and received significant shares of the proceeds of the fraudulent reclaims.

12. A number of BVI and Cayman companies were used in the scheme as Trading Counterparties or Conduit Entities. The BVI companies in question (each a "<u>BVI Third Party</u>" and collectively the "<u>BVI Third Parties</u>") are: Acai Investments Limited; Akishah Ltd; Al Msalli Ltd; Allitsen Asset Ltd; Ampersand Capital Limited; Aronex Partners Ltd; Assurity Capital Limited; Baja Ventures Ltd; Brazzle Limited (fka CBCB International Limited); Campdown Limited (fka JCJC International Limited); Castle Rock Capital Investments Limited; Ceptorbay Limited; CFS Group Corp.; Connaught Global Ltd; Darliz Ltd; Diverse Vision Limited; DTS Capital Limited; Encoreelite Limited; Equal Services Limited; FinTech Consultancy Ltd; Fire Capital One Limited; Gartside Global Ltd; Gnosis Capital Ltd; Ice Rock Limited (fka JBJB International Limited; Indus Group Limited; IP Universal Limited; Kincavel Consultants Limited; Ladhi Ltd; LDW Consultants Ltd; Lyall Capital Ltd; Maven Asset Management Ltd; Miralty International Ltd; Nisus Financial Ltd; NNPA Ltd; North Capital Group Limited;

Oakholley Ltd; Parla Global Investments Limited; Philo Capital Ltd; Philo Holdings Limited; Prince Solutions Limited; Principle Markets Limited; Rhaltall Limited; Rheidol Trading Ltd; Schmet Investments Limited; Sciron Capital Limited; Siladen Limited; Solata Capital Limited; Sole Capital Limited; Stratina Holdings Corp; Tappleton Limited (fka FBFB International Limited); TechEvolve Ltd; Tehvah Global Ltd.; Trance Services Limited; Treehurst Limited; Wicklow Global Limited; Ystwyth Trading Ltd; and Zeta Financial Partners Limited.

13. The BVI Third Parties were generally clients of Shah-controlled Custodians and are believed to be connected to Shah in other ways. For example, some individuals who established the BVI Third Parties claim to have set up these companies at Shah's request, or have another personal or professional connection to Shah. In some cases, public information shows that Shah was himself in control of the companies at issue. For example, as described at paragraph 41 below, Shah was the director of IP Universal Limited in the BVI, which in turn was a director of Acai Investments Limited, Fire Capital One Limited, Parla Global Investments Limited, and Philo Holdings Limited – all companies to which the Letters Rogatory relate.

14. SKAT's case is that the Defendants used the BVI Third Parties and other offshore companies to advance their fraudulent scheme and conceal their involvement in it.

I. **SKAT'S DISCOVERY CONCERNING THE FRAUD**

15. In seeking discovery of the fraudulent scheme, SKAT has obtained documents (including the documents attached as Exhibits 3 – 20 to this declaration) from various sources that include:

    a. Defendants' productions in SKAT's U.S. litigation;

    b. SKAT's action pending before the Dubai International Financial Centre Courts (the "DIFC court") against Elysium Global (Dubai) Limited and Elysium Properties Limited, another Shah-controlled company (together, "Elysium"); and

5

        c.   the BVI Registry of Companies and the Cayman Islands General Registry.

    16.    On September 26, 2018, SKAT commenced its action in the DIFC court against Elysium, alleging that the companies participated in the fraud of certain of the Defendants in the U.S. proceedings or received proceeds of the fraud.

    17.    During 2018, the DIFC court entered orders granting SKAT's applications to search Elysium's offices in Dubai for documents relevant to SKAT's claims.  As a result of these orders, approximately 9 million unique documents were collected from Elysium.  Under procedures established by the DIFC court, the documents are reviewed for legal privilege by a neutral third party before being turned over to SKAT, including procedures for determining any claims of privilege that Elysium may assert with respect to particular documents.  To date, approximately 6 million unprivileged Elysium documents have been disclosed to SKAT.  On December 26, 2018, the DIFC court granted SKAT permission to use the Elysium documents in proceedings in the United States.  Exhibit 3 at 2.  By Order dated March 5, 2020, this Court provided for SKAT's production of these documents to Defendants pursuant to the protections of the Court's Amended Stipulated Protective Order Governing Confidentiality of Discovery Materials, No. 18-md-2865, ECF No. 287.

## II.    INFORMATION SOUGHT FROM REGISTERED AGENTS

    18.    Because the BVI Third Parties at issue are mostly liquidated, dissolved, struck off the registry, or otherwise inactive, SKAT seeks information from their current or former registered agents.  Specifically, SKAT seeks documents from the following registered agents:

    **a. BVI Registered Agents:**

- Harneys Corporate Services Limited ("Harneys")
- Intershore Consult (BVI) Ltd. ("Intershore")
- Intertrust Corporate Services (BVI) Limited ("Intertrust")
- MMG Trust (BVI) Corp. ("MMG")

- Mossack Fonseca & Co. (B.V.I.) Limited (by its liquidator, Mr. Ryan Jarvis of Deloitte Ltd. British Virgin Islands) ("Mr. Jarvis")
- Overseas Management Company Trust (B.V.I.) Ltd. ("OMC")
- Sentinel International Management S.A. ("Sentinel")
- Vistra (BVI) Limited ("Vistra")

19. SKAT seeks the following documents in respect of each BVI Third Party:

   a. Register of shareholders;

   b. Register of directors;

   c. Customer due diligence records obtained by the Registered Agent pursuant to the Anti-Money Laundering Regulations, 2008 (as amended);

   d. Documents obtained by the Registered Agent to identify the beneficial owners of the BVI Third Parties pursuant to the Beneficial Ownership Secure Search System Act 2017 (as amended) and the Anti-Money Laundering Regulations, 2008 (as amended);

   e. Beneficial ownership records entered in the Registered Agent's RA Database pursuant to the Beneficial Ownership Secure Search System Act 2017 (as amended);

   f. Statements of account prepared by employees of the Registered Agent acting as voluntary liquidator to the BVI Third Parties that have been placed into voluntary liquidation pursuant to the BVI Business Companies Act 2004;

   g. Records and underlying documentation sufficient to show and explain the BVI Third Parties' transactions and to enable the financial position of the BVI Third Parties to be determined with reasonable accuracy prepared pursuant to the BVI Business Companies Act (as amended);

   h. Correspondence between clients of record and the Registered Agent;

7

  i. Correspondence between introducers and the Registered Agent;

  j. Correspondence between directors and the Registered Agent;

  k. Agreements for the provision of registered agent services between the Registered Agent and the BVI Third Parties, or those acting on their behalf; and

  l. Invoices issued by the Registered Agents to any of the BVI Third Parties, or those acting on their behalf, and payment records showing the payment of such invoices including but not limited to:

    i. details of the bank from which payments were made; and

    ii. supporting information to enable payments to be made including payee due diligence records obtained.

20. The requested documents will identify the individuals associated with the BVI Third Parties, including members, directors, and ultimate beneficial owners, who were involved with Defendants in the fraudulent scheme

21. The registered agents are likely to be in possession of the documents described above, because:

  a. they are required to maintain them by statute (items 19(a)-(e));

  b. they are typically filed and/or maintained by registered agents (items 19(f)-(g)); or

  c. in respect of correspondence, agreements, and transaction records (items 19(h)-(l)), they were themselves party to such correspondence, agreements, and transactions.

### III.   INVOLVMENT OF THE BVI THIRD PARTIES

22.   As set out above, the BVI Third Parties were involved in the fraudulent scheme either as Trading Counterparties that were used to generate false records, or as Conduit Entities to which the proceeds of the fraudulent scheme were forwarded.

#### A.   Fraudulent Trading

23.   Defendants' fraudulent scheme involved a number of Trading Counterparties, including the BVI Third Parties and other entities, which were used to create false, fictitious book entry transactions and records that purported to reflect the purchase, transfer, or ownership of Danish Securities. Defendants relied on the BVI Third Parties (and other entities) to conduct the fraudulent transactions that generated records purporting to evidence their purchase of shares.

24.   Defendants purported to purchase fictitious shares in a circular transaction, the true nature of which was obscured by using a variety of Trading Counterparties that, in fact, were commonly owned and acting in concert. In essence, the purchaser would buy shares from a seller that did not own them; and the seller purported to borrow the (fictitious) shares from the buyer, using intermediaries to conceal the sham nature of the transaction. Specifically, the pension plan ("Plan Defendant") would buy the shares from a short seller ("Short Seller") and lend the shares to an intermediary (or intermediaries) ("Stock Loan Intermediary"), which would lend the shares to the Short Seller that had "sold" the shares to the Plan Defendant in the first place. The legs of the fraudulent trading—the sale of purported shares from Short Seller to the Plan Defendant; the loan from the Plan Defendant to Stock Loan Intermediary; and the loan from Stock Loan Intermediary to Short Seller—all settled on the same date and at the same Custodian controlled by Shah.

25.     The result of the fraudulent trading scheme was that each of the Trading Counterparties ended up with the same amount of cash and shares it held before the transaction (which is believed to be little to no actual holdings of either cash or securities), actual shares never needed to be exchanged, and actual shares never in fact needed to exist at all in order to generate the purported trading records that Defendants used to defraud SKAT.

26.     Defendants also purported to sell the shares in forward and/or futures contracts to additional counterparties ("Forward Counterparties") to hedge market risks associated with their purported purchase of shares and potentially to transfer and/or distribute portions of the refund payments to other entities and individuals involved with the fraudulent scheme.

27.     Attached as Exhibit 4 is a document from Solo Capital Partners LLP, one of the Shah-controlled Custodians used by the Defendants, which sets out the fraudulent trading structure described above, with Solo Capital Partners acting as the Custodian.[1]  The fraudulent transactions illustrated in Exhibit 4 and described herein were then used to create false "credit advices," "income advices," "tax vouchers," or similar documents that Defendants submitted to SKAT to support their fraudulent applications.  Other Shah-controlled Custodians include Old Park Lane Capital PLC, Telesto Markets LLP, and West Point Derivatives Ltd.

### 1.     Short Sellers

28.     Trading Counterparties (including several BVI Third Parties), acting as Short Sellers, generated trading records that purported to show the sale of shares, the borrowing of shares through stock loans, and the purchase of forward and/or future contracts.

---

1.  Exhibit 4 was obtained from a production made by the defendants in SKAT's action pending before the DIFC court against Elysium, which was in possession of documents from Solo Capital Partners.

29. The Short Sellers' participation in the fraudulent trading scheme is evidenced by the fact that they never owned the shares they purported to sell: the sale was covered with a stock loan that settled with the same shares that had already been purportedly sold.

30. Attached as <u>Exhibit 5</u> is an example of a trading record purporting to show the sale of shares by BVI Short Sellers.

31. BVI Short Sellers include:

| Entity | Registered Agent |
|---|---|
| Ampersand Capital Limited | Harneys |
| Baja Ventures Ltd | Harneys |
| Brazzle Limited (fka CBCB International Limited) | Harneys |
| Campdown Limited (fka JCJC International Limited) | Harneys |
| Ceptorbay Limited | Harneys |
| Encoreelite Limited | Harneys |
| Nisus Financial Ltd | Harneys |
| Oakholley Ltd | Harneys |
| Rhaltall Limited | Harneys |
| Sciron Capital Limited | Harneys |
| Tappleton Limited (fka FBFB International Limited) | Harneys |
| CFS Group Corp. | Intershore |
| Wicklow Global Limited | Intershore |
| Maven Asset Management Ltd | MMG |
| Aronex Partners Ltd | Vistra |
| Miralty International Ltd | Vistra |

### 2. Stock Loan Intermediaries

32. Trading Counterparties (including a number of BVI Third Parties), acting as Stock Loan Intermediaries, entered into sham loans that Short Sellers used to cover their purported equity sales. The Stock Loan Intermediaries' involvement in the fraudulent trading scheme is evidenced by the fact that the stock loans settled with the same shares that the Short Sellers had purported to sell, allowing the Short Sellers to cover their sales with shares that did

not exist. Further, it appears that the Stock Loan Intermediaries were not adequately capitalized to be borrowers in a stock loan, even had actual shares been at stake: they could not have provided the necessary collateral to enable lenders (here, Plan Defendants) to pay for shares. Attached as Exhibit 6 is an example of an account statement from a Shah-controlled custodian purporting to show a series of stock loans between a Plan Defendant and Stock Loan Intermediaries. Ex. 6 at 78YORK00000076-79. Attached as Exhibit 7 is an example of a Global Master Securities Lending Agreement ("GMSLA") that existed between Stock Loan Intermediaries and Plan Defendants.

33.  BVI Stock Loan Intermediaries include:

| Entity | Registered Agent |
|---|---|
| Akishah Ltd | Harneys |
| Diverse Vision Limited | Harneys |
| Equal Services Limited | Harneys |
| FinTech Consultancy Ltd | Harneys |
| Gnosis Capital Ltd | Harneys |
| Ice Rock Limited (fka JBJB International Limited) | Harneys |
| Ladhi Ltd | Harneys |
| NNPA Ltd | Harneys |
| Philo Capital Ltd | Harneys |
| Prince Solutions Limited | Harneys |
| Principle Markets Limited | Harneys |
| TechEvolve Ltd | Harneys |
| Tehvah Global Ltd. | Harneys |
| Trance Services Limited | Harneys |
| Treehurst Limited | Harneys |
| Castle Rock Capital Investments Limited | MMG |

### 3. Forward Counterparties

34.  The Forward Counterparties (including a number of BVI Third Parties) supposedly allowed Defendants to hedge the market risks associated with their purported purchase of shares and potentially to transfer and/or distribute portions of the refund payments

made by SKAT to the Forward Counterparties and other entities involved with the fraudulent scheme. Specifically, the Forward Counterparties entered into a series of offsetting forward/futures contracts with the Defendants that used non-market prices for the relevant underlying Danish security. When these forward/futures contracts were netted, the differential pricing would give rise to a cash receivable between the Forward Counterparty and Plan Defendant that would be settled with the proceeds of the fraudulent refund request.[2] Accordingly, the structure of the forward/futures contracts provided a means by which the Forward Counterparties may have received a portion of the DWT refund, some of which may have been distributed to other entities involved in the fraud.

35. Attached as Exhibit 8 is an example of an account statement from a Shah-controlled custodian purporting to show a series of forward trades between a Plan Defendant and Forward Counterparties. Ex. 8 at ATLDHR00000117-20.

36. BVI Forward Counterparties include:

| Entity | Registered Agent |
|---|---|
| Al Msalli Ltd | Harneys |
| Allitsen Asset Ltd | Harneys |
| Connaught Global Ltd | Harneys |
| Darliz Ltd | Harneys |
| DTS Capital Limited | Harneys |
| Gartside Global Ltd | Harneys |
| Lyall Capital Ltd | Harneys |
| Rheidol Trading Ltd | Harneys |
| Sole Capital Limited | Harneys |
| Stratina Holdings Corp | Harneys |
| Ystwyth Trading Ltd | Harneys |
| Assurity Capital Limited | Mr. Jarvis |
| Kincavel Consultants Limited | Mr. Jarvis |
| North Capital Group Limited | Mr. Jarvis |
| Solata Capital Limited | Mr. Jarvis |

---

2. As forward/futures contracts can be cash-settled, as opposed to physically-settled, the parties were never required to transfer any real shares when netting out the various forward/futures contracts.

| | |
|---|---|
| LDW Consultants Ltd | OMC |

**B.   Conduits for Distribution of the Proceeds of Fraudulent Dividend Refund Claims**

37.   The proceeds of the fraudulent refund claims were ultimately shared among the various parties involved in the fraudulent scheme.  Shah, through his companies, took the vast majority of the refund proceeds related to the Defendant Plans that used Shah related custodians.  The pension plans ended up with a small fraction of the proceeds, further evidencing the fraudulent nature of the scheme.  The refunds appear to have been distributed among various entities ("Conduit Entities"), primarily through a false invoicing system, charging for services that were never actually rendered, in order to conceal the true nature of the relationships between the parties involved.  A number of BVI Third Parties were Conduit Entities.

38.   A large majority of the proceeds of the fraudulent claims went to Ganymede Cayman Ltd. ("Ganymede"), ultimately owned by Shah, or to other entities controlled by Shah associates, ostensibly for services that Ganymede provided to the pension plans.  SKAT has obtained copies of invoices from entities owned by Shah or his associates, attributing the fees due to, *e.g.*, "services agreement," "Advisory Services Agreement," or "Tax Reclaim Advisory Services."  Attached as Exhibit 9 is an example of an invoice from Ganymede to a pension plan.  Internal Elysium documents indicate that Ganymede was owned and controlled by Shah.  *See* Exhibit 10 at 6 (showing that Ganymede is 100% owned by Elysium Global (Dubai) Limited and that Shah acted as Ganymede's director); Exhibit 11 (showing that Elysium Global (Dubai) Limited is 100% owned by Shah).  Shah's control of Ganymede was effected through IP Universal Limited.  Director searches at the Cayman Islands General Registry establish that IP Universal is the listed director of Ganymede, and that Shah is the listed director of IP Universal

14

in the Cayman Islands. Similar arrangements to those described above regarding Ganymede were made with Siladen Limited and Worldwide Asset Management Limited, vehicles believed to be owned and controlled by former associates of Shah.

39. Through a further series of fraudulent invoices, the proceeds of the fraudulent reclaims cycled from Ganymede and similar vehicles either directly to certain Defendants (via Defendant-controlled Conduit Entity companies in the BVI)[3] and Trading Counterparties, or first to other Conduit Entities and then to certain Defendants (via Defendant-controlled companies) and Trading Counterparties. Attached as Exhibit 12-A is an example of an invoice from a Defendant-controlled company to Ganymede in unspecified fees (in this case, First Alton Inc., a Florida entity believed to be owned by Defendant Roger Lehman, to Ganymede for $2,012,559 in "Advisory Fees"). *See also* Exhibit 12-B (First Alton Inc. to Acai Investments Limited for $3,977,888.05 in "Consultancy Fees"). Attached as Exhibit 13 is an example of a consultancy services agreement between a Defendant-controlled company, again First Alton Inc., and a Conduit Entity, again Acai Investments Limited.

40. BVI Conduits Entities include:

| Entity | Registered Agent |
|---|---|
| Acai Investments Limited | Harneys |
| Fire Capital One Limited | Harneys |
| IP Universal Limited | Harneys |
| Parla Global Investments Limited | Harneys |
| Philo Capital Ltd | Harneys |
| Philo Holdings Limited | Harneys |

---

3. Based on the information reviewed by Plaintiff SKAT to date, Plaintiff has reason to believe that ultimate beneficial owners ("UBO") of these companies included, but were not limited to, the following Defendants: Roger Lehman was UBO of First Alton Inc. and SSM LLC; Doston Bradley was UBO of India Atlantic Inc., Atlantic India Inc., Pacific India Inc., and India North Atlantic Inc.; Matthew Tucci was UBO of Icon Beach Inc., Starfish Dunes Inc., Sand Dollar Inc., and Lava Beach Inc.; Gavin Crescenzo was UBO of Comisana Inc. and Saba Inc.

| | |
|---|---|
| Zeta Financial Partners Limited | Harneys, MMG |
| Siladen Limited | Intertrust, Sentinel |
| Indus Group Limited | MMG |
| Schmet Investments Limited | Sentinel |

41.     SKAT has already obtained some direct evidence suggesting the BVI Conduit Entities were controlled by Shah or his former associates. Documents from the BVI Registry of Companies suggest that the director of Acai Investments Limited, Fire Capital One Limited, Parla Global Investments Limited, and Philo Holdings Limited was "IP Universal Limited." *See* Exhibit 14.[4]  It is unclear if this is referring to the Cayman Islands-incorporated IP Universal Limited, or the BVI-incorporated IP Universal Limited, but Shah was a director of both.[5]  The Letters Rogatory also request information in respect of IP Universal, given its role described in this paragraph.

42.     Certain of the Conduit Entities also illustrate the features common to the fraudulent applications conducted via both Shah-controlled custodians and those conducted via ED&F Man.  For example, Plan Defendants Acorn Capital Strategies LLC Employee Pension Profit Sharing Plan & Trust and Sterling Alpha LLC 401(k) Profit Sharing Plan submitted fraudulent reclaims to SKAT based on "credit advices" from both ED&F Man and a Shah-

---

4. It is clear that IP Universal is a director of each company because these documents are letters from Harneys, as Registered Agent, to the directors of each BVI Company stating Harneys' intention to resign as registered agent. Under BVI law (specifically ss. 93(3) of the BVI Business Companies Act 2004), when a registered agent resigns, it must send the letter of resignation to a director of the company.

5. This has been confirmed by:
   - An in-person director search of the Cayman Islands General Registry conducted by Kobre & Kim (Cayman) on March 6, 2020 in respect of Ganymede and IP Universal Limited in the Cayman Islands.
   - The declaration of solvency filed for IP Universal Limited in the BVI, which was signed by Shah personally as director. See Exhibit 15.

controlled custodian. *See* Exhibits 16-A – 16-B, Exhibit 17-A – 17-B. Zeta Financial Partners and Indus Group Limited coordinated the purported transactions for these Defendant Plans and others during the period when they had relationships with both of these custodians. *See, e.g.*, Exhibit 18-A – 18-C. Further, Zeta Financial Partners and Indus Group Limited are believed to have received the significant portion of the DWT refund paid by SKAT to these Defendant Plans. *See, e.g.*, Exhibit 19 at 11; Exhibit 20.[6]

\* \* \* \* \*

      I, NEIL J. OXFORD, hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       April 27, 2020

                                        /s/ Neil J. Oxford
                                        NEIL J. OXFORD

---

6. Exhibit 20 is an excerpt of a spreadsheet provided by ED&F Man's counsel, showing that Zeta Financial Partners received DKK 4,270,581 of a refund to Acorn Capital Strategies LLC Employee Pension Profit Sharing Plan & Trust of DKK 7,490,000, or more than 57% of the refund.